*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DJH,

        Petitioner-Appellee,

v

GMB,

        Respondent-Appellant.

UNPUBLISHED
April 09, 2026
2:05 PM

Nos. 369690; 373371
Gladwin Circuit Court
LC No. 23-011905-PH

Before: KOROBKIN, P.J., and YOUNG and BAZZI, JJ.

PER CURIAM.

The parties in this matter are two siblings feuding over property they share as tenants in common. After having an argument on the property one day, one of the siblings, DJH, sought a personal protection order (PPO) against his sister, GMB.[1] The trial court issued the PPO ex parte against GMB, and by motion of DJH, subsequently extended the PPO for one additional year.[2] On appeal, GMB, appearing *in propria persona*, argues the trial court abused its discretion issuing the PPO ex parte and later granting an extension. Finding that no grounds supported entry of the original PPO ex parte nor the extension thereof, we reverse and remand for further proceedings.

## I. FACTUAL AND PROCEDURAL HISTORY

DJH and GMB, a brother and sister, have co-owned the subject property in Gladwin County since March 9, 2013. Neither party disputes that GMB and DJH jointly own the property and share equal rights with respect to the property. However, at some point, the parties began arguing over who was living at the property, whether those persons were paying rent, and the

---

[1] We refer to the parties by their initials to avoid identifying the party protected by the PPO. See MCR 3.705(C); 18 USC 2265(d)(3).

[2] Although the PPO against GMB expired prior to this Court deciding the instant appeal, PPO expiration alone does not render its appeal moot. See *TM v MZ*, 501 Mich 312, 319; 916 NW2d 473 (2018).

general conditions of the property. GMB was specifically concerned that DJH was letting others live at the property rent-free and did not approve of how he was maintaining it.[3]

The events leading to the issuance of a PPO in this case occurred on September 8, 2023. DJH testified that on that afternoon, he was back by the barn[4] on the property when DJH's son notified him that "someone's here." GMB had driven to the property with her and DJH's other sister. GMB went inside the home to identify an area to keep some of her belongings. DJH's son and DJH's then-girlfriend were in the home too. GMB testified that upon her entry, she and DJH's girlfriend exchanged some unpleasant words, with the girlfriend ultimately "flipping [GMB] off." GMB relayed her version of the argument between herself, DJH, and his girlfriend as follows:

> [DJH] said "nothing here is yours, all of this stuff is mine." I said "well, if there's nothing here mine then I want to sell." And he's like "fuck you, fuck you, fuck you." Then his girlfriend comes outside, steps outside, she's on the porch. And I told her, because she's sticking her nose in her business again, I says "your nobody, you're just the girl he's f-in." And he says "well, at least I got somebody, nobody likes you." I'm like phew so, I got in the truck and left.

DJH's version of the argument was not wholly distinct:

> Okay, well she did, [my girlfriend] didn't know who she was, but she figured out really quick who she was, and her demeanor just didn't work with hers and I think she actually told her to F off. And [GMB] said, "you're just someone that is screwing DJH." Not even—she didn't even say her brother. So, and I responded to that was, "at least I have someone who loves me." [A]nd she's like "I don't want no one" and I said "it's because no one will have you.["]
>
> *   *   *
>
> —And—and then and after that she threatened, she says "well, were just going to sell the place or better yet, I'll move in."

According to both parties, after this exchange, GMB got in her vehicle and left. About five to ten minutes later, GMB returned to the property, so DJH locked the doors. DJH testified that GMB was outside yelling things like, "oh thanks, thanks for locking the doors." But GMB claims that when she returned, all she had said through the open window was, " 'since you need help, I am going I will come back up and help you, I will move a bed up here.' And that was it, I drove away." DJH called the police to report the incident and GMB drove away.

---

[3] GMB testified, among other things, that DJH allowed the house to go into foreclosure, that the foundation needed fixing, and that the roof needed repairs. She testified that she had to refinance the house in order to complete all necessary repairs and that she paid on the foreclosure out of pocket. She also testified that she paid for insurance on the home and made the house payments until DJH moved in and allowed others to come live "for free."

[4] DJH testified that the barn was about 100 to 150 yards away from the residence itself.

GMB did not return to the property again, but DJH testified that he did receive a text from her after he drove to the courthouse to obtain a copy of the deed, stating, "I know that you were just there getting a copy." This text made DJH feel like GMB "was stalking [him], harassing [him]. Like she knew where [he] was and what [he] was doing and had eyes on [him]." This is the only message via text or other direct method of communication that DJH alleges he received from GMB in connection with this event. GMB testified that when she texted DJH after he left the courthouse, it was to send him the definition of "tenants in common" that she retrieved from a google search. She did this to show him that she "had the right to occupy the property as long as tenancies in place." We note that neither party submitted any copies of these text messages into evidence and that our only understanding of these exchanges comes from their later in-court testimonies.

In response to the arguments on September 8 and the text message(s) he subsequently received, DJH sought a PPO against GMB, claiming in his petition that he was "afraid for [his] safety & security of [his] son & partner." In his petition, DJH checked the box to request entry of the PPO ex parte, on the grounds that "immediate and irreparable injury, loss, or damage will occur between now and a hearing or because notice itself will cause irreparable injury, loss or damage before the order can be entered." He further explained in his petition,

> [GMB] entered household, upset [my] son. Son ran out & retrieved me from field I was brush hogging. I came in house and she stated she was looking to see how much room for her stuff. I told her to leave, she left, but as she was said she's forcing sale or better yet, she is moving in. Then she entered her vehicle, left. I went inside my home & locked doors. Within 5 mins of leaving property, she returned. Yelling, mad she was locked out. I called police, and before they were dispatched, she left.

The trial court granted the petition ex parte and the PPO went into effect on September 14, 2023.

On September 28, 2023, GMB moved to terminate the PPO. In her motion, GMB placed blame on DJH for the altercation, labeling him as the aggressor, and stated that she "pose[s] no threat of harm to [DJH, his son,] or his . . . fiancé." The trial court heard GMB's petition to terminate the PPO on January 22, 2024. When DJH was asked why he sought the PPO against his sister, DJH testified that "he felt threatened and [GMB] upset the household." DJH explained that he wanted the PPO to remain in place because it made him feel safer and because he believed that it was "the best solution" while confirming that following issuance of the PPO, there were no further interactions between him and GMB. DJH was asked whether he believed there would be any backlash with GMB, should the PPO be terminated, to which he replied, "[a]t some point there probably would be. I don't know if it would be immediate or a year or 2 after, or I—I might just have to sell the place."

GMB, representing herself, cross-examined DJH, before taking the stand herself to testify. Many of GMB's questions to DJH focused on who was living in the house at the time and whether or not they were paying rent, emphasizing that "this is what the whole fights about." As the parties argued on the record, the trial judge intervened, stating "I don't wanna hear about your childhood, your siblings. I don't want to hear about, 20 years ago. I want to hear about what brought us here on this PPO." GMB then asked DJH about her conduct during the September 8 incident, stating:

*Q*:  How did I threaten you?

                \*      \*      \*

*A*:  Your demeanor, you're coming in, you being very rude and aggressive towards [my girlfriend], and [son] crying, and the whole situation, it was not pleasant.  You upset me obviously, you could have handled that a lot better so could have I.  But however, it went down it was very traumatic for [my girlfriend] and for [my son].  And I did not know where you're going to go with this afterwards.  You threatened me by selling the property, and moving in.

                \*      \*      \*

*Q*:  Just because my presence is there, that's a threat?

*A*:  You are threatening.

*Q*:  How am I a threat.

*A*:  . . . Your presence is threatening just in itself.  Your attitude, your facial expressions, what you say, your cont—how how you control the situation, how you are aggressive.  I don't know, I don't know how to explain you.  It—It—it's not pleasant, it's scary.  Anyone else that's been interacted with you knows how you are, they do not really like you.  I don't know how to explain what you are, you should yourself.  I would have to say it's threatening, it's scary.  You're a scary person, I don't know how else to say it.

GMB and DJH's sister, who witnessed the September 8 argument at the property also testified at the hearing.  Regarding her observations of GMB's conduct, the sister testified:

*Q*:  Did I threaten [DJH] at any time?

*A*:  No.

*Q*:  Did I threaten [his son]?

*A*:  No.

*Q*:  Did I threaten his girlfriend?

*A*:  No.

*Q*:  Did I—

*A*:  You didn't even raise your voice.

                \*      \*      \*

*Q*:  Did I rifle through any of the belongings in the house?

*A*: No, you didn't even touch anything.

*Q*: Did I go in any buildings?

*A*. Just the house.

The following day, on January 23, 2024, the trial judge issued an order denying GMB's motion to terminate the PPO, checking the box that provided, "circumstances continue to exist that would require extension/modification of the order."

On August 30, 2024, DJH filed a motion to extend the PPO. In the motion, DJH asserted that "the issue that occurred has not been resolved. [GMB] is forcing sale. Refused to work [through] lawyers to resolve for almost whole period since order was issued. My lawyer even felt he was harassed by [GMB]." He also stated that GMB continued to send "harassing and menacing messages through family and acquaintances" and that he and his son are "convinced once PPO is lifted, [GMB] will immediately be harassing" them. DJH did not attach any exhibits to his motion to support these assertions or otherwise include any evidence of harassment occurring after entry of the PPO.

The trial court held a hearing on the motion on September 9, 2024, but GMB failed to appear. At the hearing, the court asked DJH to explain his concerns should the PPO be lifted. DJH responded:

> I and also my son, believe that she will be right there or right back to the same thing, harassing and I mean it's been evident every time she has an inch she takes a mile. So, just like during court she said that she would work with me and then once we walked out she's like "I'm selling the place." You know, and the lawyer was like "Well, that didn't take long." So, I'm sure if this is lifted, she's going to be right there, right on the property, in my face, doing all the stuff over and maybe even worse."

Throughout his testimony, DJH never said that GMB continued to stalk, harass, or even communicate with him since the PPO was entered. Rather, his testimony reiterated the events that lead to entry of the original PPO. The trial court issued an order granting the motion, as "circumstances that exist, appellant still has ownership to property" thereby extending the PPO until September 14, 2025.

GMB moved for reconsideration, which was heard by the trial court on October 28, 2024. At the hearing, GMB argued that she was not properly served DJH's motion to extend the PPO, despite the proof of service filed by DJH indicating otherwise. The trial court denied the motion. This appeal followed.

## II. ANALYSIS

### A. STANDARD OF REVIEW

"The granting . . . of a PPO is within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion." *SP v BEK*, 339 Mich App 171, 176; 981 NW2d

500 (2021). "An abuse of discretion occurs when the decision resulted in an outcome falling outside the range of principled outcomes." *Hayford v Hayford*, 279 Mich App 324, 325; 760 NW2d 503 (2008). A mere difference in judicial opinion does not establish an abuse of discretion. *Alken-Ziegler, Inc v Waterbury Headers Corp*, 461 Mich 219, 228; 600 NW2d 638 (1999). The trial court's underlying findings of fact are reviewed for clear error. *CAJ v KDT*, 339 Mich App 459, 464; 984 NW2d 504 (2021).

## B. LEGAL BACKGROUND

MCL 600.2950a allows for entry of a PPO to restrain or enjoin an individual from engaging in conduct provided in MCL 750.411h (stalking), MCL 750.411i (aggravated stalking), or MCL 750.411s (online stalking). MCL 600.2950a(12) allows for entry of a PPO ex parte only where it "clearly appears from specific facts shown by a verified complaint, written motion, or affidavit that immediate and irreparable injury, loss, or damage will result from the delay required to effectuate notice or that the notice will precipitate adverse action before a personal protection order can be issued." "The petitioner bears the burden of establishing reasonable cause for issuance of a PPO[.]" *Hayford*, 279 Mich App at 326.

When a petition for an ex parte PPO is based on MCL 750.411h, the "petitioner [i]s required to demonstrate that respondent's conduct amounted to stalking as defined by the statute." *Berryman v Mackey*, 327 Mich App 711, 718; 935 NW2d 94 (2019) (citations omitted). "In determining whether to issue a PPO, the trial court is not limited to the petition itself but may consider additional testimony, documents, and "other evidence proffered to determine whether a respondent engaged in harassing conduct." *Id*. at 711 (citing MCL 600.2950a). MCL 750.411h(1) defines "harassment" and "stalking" in the following manner:

(c) "Harassment" means conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable individual to suffer emotional distress and that actually causes the victim to suffer emotional distress. Harassment does not include constitutionally protected activity or conduct that serves a legitimate purpose.

(d) "Stalking" means a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested.

MCL 750.411h(1) also defines "course of conduct" and "unconsented contact" as:

(a) "Course of conduct" means a pattern of conduct composed of a series of 2 or more separate noncontinuous acts evidencing a continuity of purpose.

\* \* \*

(e) "Unconsented contact" means any contact with another individual that is initiated or continued without that individual's consent or in disregard of that individual's expressed desire that the contact be avoided or discontinued.

An individual against whom an ex parte PPO has been entered may move to rescind the PPO. See MCL 600.2950a(13) and (14). "The petitioner bears the burden . . . of establishing a justification for the continuance of a PPO at a hearing on the respondent's motion to terminate the PPO." *Hayford*, 279 Mich App at 326.

## C. THE TRIAL COURT ABUSED ITS DISCRETION IN ISSUING THE PPO EX PARTE

MCL 600.2950a(12) (emphasis added) only authorizes a PPO to be entered ex parte where a party provides ". . . specific facts shown by a verified complaint, written motion, or affidavit that *immediate and irreparable injury, loss, or damage will result* from the delay required to effectuate notice or that the notice will precipitate adverse action before a personal protection order can be issued." DJH's petition checked the box indicating that "immediate and irreparable injury, loss, or damage" would result from any delay flowing from giving notice to GMB, but, the petition alleged no facts to support this assertion. Instead, all that we can gather from DJH's petition is that GMB threatened to sell the home, and because GMB and DJH share equal property rights to the home, we do not believe that GMB's statements regarding sale amount to irreparable injury to DJH. Because DJH failed to show that he would sustain immediate and irreparable injury if notice was given to GMB, the trial court abused its discretion in entering the PPO ex parte.

## D. THE TRIAL COURT ABUSED ITS DISCRETION IN EXTENDING THE PPO

Even if this Court agreed that the trial court had sufficient grounds to issue the PPO ex parte, we find that the trial court abused its discretion in extending the PPO for an additional year. To begin, the record before us contains limited support that GMB engaged in "stalking" or "harassment," as those terms are defined by statute, to support issuance of the initial PPO against her. Between the additional evidence regarding the September 8 incident and the lack of additional contact beyond that, the PPO should not have been extended.

Although DJH repeatedly claimed at the termination hearing that GMB's behavior on the day of the incident was "threatening," he failed to articulate any facts to show that GMB subjected him to "repeated or continuing unconsented contact that would cause a reasonable individual to suffer emotional distress." On cross examination, when DJH was asked to specify how GMB threatened him, he stated:

> *A*: Your demeanor, you're coming in, you being very rude and aggressive towards [my girlfriend], and [son] crying, and the whole situation, it was not pleasant. You upset me obviously, you could have handled that a lot better so could have I. But however, it went down it was very traumatic for [my girlfriend] and for [my son]. And I did not know where you're going to go with this afterwards. You threatened me by selling the property, and moving in.

> \*   \*   \*

> *A*: . . . Your presence is threatening just in itself. Your attitude, your facial expressions, what you say, your cont—how you control the situation, how you are aggressive. I don't know, I don't know how to explain you. It—It—it's not pleasant, it's scary. Anyone else that's been interacted with you knows how you are, they do not really like you. I don't know how to explain what you are, you

should yourself. I would have to say it's threatening, it's scary. You're a scary person, I don't know how else to say it.

Beyond this, the only other evidence offered in this matter, the testimony of the nonparty sister, showed that GMB did not harass DJH.

There is also limited evidence on the record suggesting that GMB engaged in a "course of conduct" of "stalking." Even if the September 8 argument and the subsequent text messages were sufficient to show "a series of 2 or more separate noncontinuous acts evidencing a continuity of purpose," it does not appear that GMB's conduct during any of these exchanges would cause a reasonable person to feel "terrorized, frightened, intimidated, threatened, harassed, or molested." Further, given GMB's testimony that "[DJH] never once told [her] to get out of the house. He's never once told [her] not, to text him or call him . . . ," we cannot conclude that GMB's communications were "unconsented contact," as defined in the statute. And, neither party contests GMB is an owner of the property. See *CAJ*, 339 Mich App at 464 (we give deference to the factual findings of the trial court).

As we find questionable whether a PPO should have been issued at all, we find no support in the record to extend it beyond the one-year term. In DJH's motion to extend, he claimed that the issues between the parties had not yet been resolved, and that GMB continued to insist on the sale of the property. The motion further stated that GMB refused to work with lawyers to resolve these issues and continued sending "harassing and menacing messages through family and acquaintances." As was the case with his initial petition, DJH failed to provide any evidence to support these statements. At the hearing, he testified:

> I and also my son, believe that she will be right there or right back to the same thing, harassing and I mean it's been evident every time she has an inch she takes a mile. So, just like during court she said that she would work with me and then once we walked out she's like "I'm selling the place." You know, and the lawyer was like "Well, that didn't take long." So, I'm sure if this is lifted, she's going to be right there, right on the property, in my face, doing all the stuff over and maybe even worse.

These statements amount to nothing more than speculation. Although DJH believes GMB will likely return to the property following termination of the PPO, he fails to show any present concerns that would justify an extension of the PPO, especially with respect to someone with ownership rights to the property. The petitioner bears the burden of establishing a justification for continuance of a PPO at a hearing on a motion to terminate the PPO. *Hayford*, 279 Mich App at 326. Because we believe DJH failed to meet his burden, we find that the trial court abused its discretion in granting the extension. See *AMA v MWA*, unpublished per curiam opinion of the Court of Appeals, issued April 28, 2022 (Docket No. 357438), p 3 (finding the trial court abused its discretion in extending a PPO where the petitioner offered credible testimony regarding the petitioner's fear, but failed to present evidence to suggest that the respondent may commit a prohibited act in the future).

-8-

Reversed and remanded for further proceedings consistent with this opinion.  We do not retain jurisdiction.

/s/ Daniel S. Korobkin
/s/ Adrienne N. Young
/s/ Mariam S. Bazzi